# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 16-cv-61742-BLOOM/Valle

PRIVILEGE UNDERWRITERS
RECIPROCAL EXCHANGE,
d/b/a Pure Insurance,

      Plaintiff,

v.

THE HANOVER INSURANCE GROUP,
d/b/a Massachusetts Bay Insurance Company,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a bench trial held over the course of one day on October 16, 2017. *See* ECF No. [43]. Prior to trial, the parties filed their Proposed Findings of Fact and Conclusions of Law. *See* ECF Nos. [25] and [26]. The Court has carefully considered the evidence presented at trial, the applicable law, and the parties' submission, and sets forth its relevant findings of fact and conclusions of law below.

## I.    INTRODUCTION

This case arises from a lawsuit filed in the Seventeenth Judicial Circuit in and for Broward County styled as *Bradley J. Edwards, et. al. v. Alan M. Dershowitz* (the "underlying lawsuit). *See* ECF No. [44-8]. In the underlying lawsuit, attorneys Bradley J. Edwards ("Edwards") and Paul G. Cassell ("Cassell") alleged defamation claims against Alan Dershowitz ("Dershowitz"). *Id.* It was alleged that, after Edwards and Cassell filed legal pleadings that referenced Dershowitz in an unrelated federal lawsuit, Dershowitz then "initiated a massive public media assault on the reputation and character" of Bradley and Cassell. *Id.* The parties in

this case each insured Dershowitz under different policies during the time the allegedly defamatory statements were made. Privilege Underwriters Reciprocal Exchange ("PURE") issued a homeowner's insurance policy to Dershowitz whereas The Hanover Insurance Group ("Hanover") issued a business owner's insurance policy to Dershowitz. Eventually, the parties in the underlying lawsuit entered into a confidential settlement. Both PURE and Hanover contributed to the settlement. In this case, PURE filed a claim for equitable subrogation, seeking to recover the amount it contributed toward the settlement from Hanover.

## II. FINDINGS OF FACT

### a. Stipulated Facts[1]

In the underlying lawsuit, it was alleged that Dershowitz made defamatory statements from his home during an interview broadcast on international media outlets, including CNN. *See* ECF No. [24] at ¶ F. PURE issued a *homeowners' policy* to Dershowitz, which provides as follows: "if a claim is made or a suit is brought against an insured for damages because of personal injury . . . caused by an occurrence anywhere in the world to which this coverage applies, we will [p]ay up to the liability coverage limits shown on your Declarations for which an insured is legally liable." *Id.*at ¶¶ A and D. The PURE policy defined "personal injury" to include injury arising out of defamation, libel or slander. *Id.*at ¶ D.

Hanover issued a *business owner's policy* to Dershowitz. *Id.* at ¶ B. The Hanover policy provides that it "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies." *Id.* at ¶ E. The Hanover policy further states that it applies to "'personal and advertising injury' caused by an offense arising out of your business."

---

[1] In their Joint Pre-Trial Stipulation, the parties stipulated to a series of facts that required no proof at trial. *See* ECF No. [24] at 4-6. Therefore, the Court cites to the parties' Pre-Trial Stipulation, ECF No. [24], for all such agreed-upon facts.

Both PURE and Hanover provided a defense and contributed to the eventual settlement of the underlying lawsuit under separate reservations of rights. *Id.* at ¶ C. Significantly, both the PURE and Hanover policies contained an "other insurance" provision. The PURE policy states:

> N. Other Insurance and Service Agreement
>
>> 2. Any coverage under SECTION III – LIABILITY COVERAGE will be excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

*Id.* at ¶ G. The Hanover policy contains the following provision:

> **H. Other Insurance**
>
>> **2. SECTION II- LIABILITY**
>>
>>> If other valid and collectible insurance is available to the insured for a loss we cover under **SECTION II- LIABILITY,** our obligations are limited as follows:
>>>
>>>> **a. Primary Insurance**
>>>>
>>>> This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.
>>>>
>>>> **b. Excess Insurance**
>>>>
>>>> This insurance is excess over:
>>>>
>>>>> **1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:
>>>>>
>>>>>> **(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
>>>>>> **(b)** That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;
>>>>>> **(c)** That is insurance purchased by you to cover your liability as a tenant for

"property damage" to premises rented to
you or temporarily occupied by you with
permission of the owner; or

**(d)** If the loss arises out of the maintenance
or use of aircraft, "autos" or watercraft
to the extent not subject to **Exclusion g.
Aircraft, Auto or Watercraft** of [sic]

**2)** Any other primary insurance available to you
covering liability for damages arising out of the
premises or operations, or the products and
completed operations, for which you have been
added as an additional insured by attachment of an
endorsement.

*Id.* at ¶ H.

### b. Testimony of Vanessa Perkins

PURE's only witness at trial was Vanessa Perkins – the claims analyst who handled
Dershowitz's defense in the underlying lawsuit under the PURE policy. The claim against
Dershowitz was reported to PURE in January of 2015. Upon receipt of the claim, Ms. Perkins
reviewed the complaint and summons and determined there was potential coverage under the
PURE homeowner's policy.[2] She then reached out to the insurance broker to determine if
Dershowitz had other insurance that may apply. *See* ECF No. [44-9] at 4. On January 14, 2015,
Richard Ward informed Ms. Perkins via email that there were three policies in effect for the loss
– a homeowner's policy issued by PURE, a business owner's policy issued by Hanover, and a
lawyer's professional policy issued by non-party CNA. *Id.* at 3. Mr. Ward further stated: "It
seems that each of you [referring to the three insurance companies] are issuing ROR's
[Reservations of Rights] while awaiting coverage review. Pure has extended initial defense and

---

[2] PURE also issued a Personal Excess Liability Policy to Dershowitz; however, PURE denied coverage to
Dershowitz under this policy. ECF No. [44-5] at 5 ("As such, because this policy does not provide
coverage for libel or slander in the first instance, there is no need to cite any other coverage provision at
this time as no coverage is afforded under the Personal Excess Liability Policy for the claims raised in the
Complaint.").

the insured is in the process of selecting counsel so that the complaint can be answered. Vanessa, once coverage counsel is identified please confirm that the complaint is being answered in a timely fashion." *Id.* On that same day, Hanover, through Regional Liability Adjustor Colleen D. Ewert, emailed Ms. Perkins and others, informing them that Hanover was "investigating under a general reservation of rights." *Id.* at 1. According to Ms. Perkins, all three insurance companies agreed to split the cost of defense three ways and they were all handling the case under a reservation of rights. At no point in time did PURE receive the individual reservation of rights letters issued by Hanover or CNA to Dershowitz. Similarly, at no point in time prior to the filing of this lawsuit, did PURE inform Hanover or CNA that it may seek to recover its cost of defense in the underlying lawsuit. At trial, Ms. Perkins admitted that the three insurers did not enter into a subrogation agreement.

On January 21, 2015, PURE sent a reservation of rights letter to Dershowitz in which it informed him that "[w]hile reserving its right to deny coverage, PURE will provide a defense to you through mutually agreeable independent counsel, under a complete reservation of rights." ECF No. [44-5] at 1. Analyzing coverage under the homeowner's policy, PURE advised Dershowitz that "because the Complaint against you alleged defamation, the High Value Homeowner's Policy potentially provides coverage for at least some of the alleged claims presented." *Id.* at 3. Consistent with this statement, at trial, Ms. Perkins agreed that the homeowner's policy provides coverage for any occurrence that causes personal injury anywhere in the world, that defamation is included in the definition of "personal injury" under the homeowner's policy and that Mr. Dershowitz was sitting in his home in Florida, which is identified as the insured location under the policy, at the time he made the allegedly defamatory statements on CNN.

In the January 21, 2015 letter, PURE also invoked the "Expected or Intended Injury Exclusion," which provides as follows:

**D. Exclusions**

> We do not provide coverage for damages, defense costs or any other cost or expense for:
>
> . . .
>
> **16. Expected or Intended Injury**
>
> Personal injury or property damage resulting from any criminal, willful, intentional, or malicious act or omissions by any insured which is intended to result in, or would be expected by a reasonable person to cause personal injury or property damage. This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person than expected or intended. This exclusion does not apply to bodily injury if the insured acted with reasonable force to protect any person or property.

*Id.* at 3-4 (emphasis omitted). On the basis of this exclusion, PURE advised Dershowitz that it "reserves its right to deny coverage to the extent the alleged defamation was made willfully, intentionally or maliciously and was intended or expected to caused [sic] personal injury." *Id.* at 4. At the conclusion of its coverage analysis, PURE also informed Dershowitz that it "does not waive, but expressly reserves any and all rights to amend this reservation of rights and to assert any applicable policy provisions and grounds for denial of coverage." *Id.* at 5. At trial, Ms. Perkins explained that the "Expected or Intended Injury" exclusion was the only exclusion that PURE invoked as a basis not to indemnify the insured for the underlying claim. PURE never supplemented this letter to raise a priority-of-coverage issue among any of the three insurers. Ms. Perkins admitted that the Hanover policy contains a very similar exclusion for intentional acts of the insured and that, if there is no coverage under PURE's homeowner's policy because

of the "Expected or Intended Injury" exclusion, then there is no coverage under the same exclusion of the Hanover policy.

On February 24, 2015, Ms. Perkins spoke with Ms. Ewert about the case and exchanged some emails with her, but she did not request a copy of the Hanover policy or raise a concern about priority of coverage among the three carriers. As the underlying lawsuit progressed, the subject of mediation arose in October of 2015. PURE initially indicated it would not participate because the reservation of rights was still in place and coverage was still at issue. It was PURE's position, as explained by Ms. Perkins, that the homeowner's policy provides a defense for defamation, but it does not indemnify for it. However, on October 19, 2015, Ms. Perkins sent an email in which PURE agreed to contribute a sum certain toward the settlement. This email did not state that the contribution was made subject to its reservation of rights or subject to a right of subrogation. From the time PURE received the notice of claim on January 7, 2015 until the time it agreed to contribute toward the settlement on October 19, 2015, PURE did not reserve its rights based on priority of coverage.

Prior to the mediation, on November 6, 2015, Ms. Perkins participated in a conference call with Ms. Ewert and Ms. Frank from CNA in which they each agreed to contribute to the settlement. During this call, Ms. Perkins did not raise priority of coverage between the three insurers. The parties attended the mediation in the underlying lawsuit, but it did not result in a settlement. On November 22, 2015, defense counsel contacted the three insurers seeking additional settlement authority. Both Hanover and CNA agreed to increase defense counsel's settlement authority, but PURE declined, citing to the coverage exclusion and indicating that nothing had changed in the last two weeks. Following this exchange, PURE received letters from Dershowitz's personal counsel suggesting that PURE was acting in bad faith. On

December 4, 2015, PURE increased the amount of its settlement contribution, which is ultimately the amount it paid to fund its portion of the settlement.

Also around this timeframe, Ms. Perkins reached out to defense counsel, Mary Borja, to request a copy of the Hanover and CNA insurance policies to review the language in their respective "other insurance" clauses. ECF No. [44-17]. Ms. Borja, in turn, reached out to the three insurance companies on November 25, 2015 to obtain authority to share the policies among the insurers. *Id.* Later that same day, Ms. Ewert from Hanover responded by stating: "Yes, you have authority to share the Mass Bay policy if we can have copies of the PURE and CNA policies." *Id.* As of December 4, 2015, PURE had yet to receive either Hanover or CNA's insurance policies when it increased the amount of its settlement contribution. On December 15, 2015, defense counsel sent an email to the three insurance companies that stated: "The insurers' policies are attached." ECF No. [44-18]. Attached to the email was the PURE policy, Hanover's endorsements to the policy, and the CNA policy. *Id.* According to Ms. Perkins, this email did not contain the portion of the Hanover policy needed to conduct a priority of coverage analysis.

On February 26, 2016, Ms. Perkins received the Hanover policy for the policy period from April 9, 2015 to April 9, 2016; however, this was a renewal policy. *See* ECF No. [44-2].[3] Upon receipt of the Hanover renewal policy, Ms. Perkins reviewed its language, compared it to PURE's policy, and determined that there was an issue regarding priority of coverage as she believed the Hanover policy was primary. Ms. Perkins declined to raise the issue at that time because the parties were close to resolving the case and she believed it was in Dershowitz's best interest to not raise the issue and risk losing the settlement. In fact, PURE did not raise priority of coverage at any point during the underlying lawsuit. PURE similarly did not secure any

---

[3] This is not the Hanover policy that applies to the claims made against Dershowitz. Instead, the applicable policy is the one located at ECF Nos. [44-23] and [44-24].

agreement from Hanover or CNA that issues involving priority of coverage would be resolved after the settlement of the underlying lawsuit. The settlement agreement in the underlying lawsuit was eventually signed in March or April of 2016. Nothing in the settlement agreement, or any other agreement, preserved PURE's ability to recover its defense costs and indemnity contribution. PURE's only evidence of a preservation of its right to seek contribution from Hanover for its share of defense costs and its indemnity contribution is the January 14, 2015 email from the insurance broker to PURE, Hanover, and CNA. However, this email did not raise priority of coverage and did not preserve a right to subrogation.

### c. Testimony of Stephen Colville

Hanover also presented the testimony of a single witness, Stephen Colville. Mr. Colville took over the handling of the Dershowitz claim on behalf of Hanover after Ms. Ewert took a leave of absence in late February or early March of 2016. Hanover first received notice of the claim against Dershowitz on January 9, 2015. Following receipt of the claim, on January 14, 2015, Hanover issued a general reservation of rights letter to Dershowitz informing him that coverage may not be triggered for the claim under the policy. *See* ECF No. [44-3]. Thereafter, on February 6, 2015, Hanover sent a second reservation of rights letter. *See* ECF No. [44-4]. In both letters, Hanover informed Dershowitz that allegations that he "acted in 'willful, wanton, reckless, and intentional disregard . . .' of [Edwards and Cassell's] rights may not meet the definition of bodily injury, property damage, personal and advertising injury, wrongful acts or damages as defined" in the policy. ECF Nos. [44-3] and [44-4]. Mr. Colville described this as the "intentional acts exclusion." The letters also informed Dershowitz that the policy "requires that the insurance applies to personal injury caused by an offense arising out of your business" and "[c]omments made from your personal residence may not constitute arising out of your

business." *Id.* This referred to the policy's business liability insurance for "'personal and advertising injury' caused by an offense arising out of [the insured's] business, but only if the offense was committed in the 'coverage territory' during the policy period." ECF No. [44-23] at 71-72.

On March 13, 2015, Hanover sent a supplemental reservation of rights letter to Dershowitz in which it reiterated that there was no coverage for "personal and advertising injury" consisting of discrimination or humiliation that results in injury to reputation done intentionally by or at the direction of the insured. ECF No. [44-10] at 6-7. In addition, Hanover asserted an additional exclusion that did not cover "personal and advertising injury" "caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict 'personal advertising injury'" or "arising out of oral or written publication of material, if done, by or at the direction of the insured with knowledge of its falsity." *Id.* at 7. Finally, Hanover asserted the "Professional Services" exclusion, which excludes coverage for "bodily injury," "property damage," or "personal and advertising injury" arising out of the rendering of or failure to render any professional service by the insured. *Id.* According to Mr. Colville, Hanover did not agree there was coverage for the claims, but it believed there may be a duty to defend so it provided a defense under a reservation of rights.

On March 18, 2015, Hanover agreed to participate in the insured's defense by paying an equal share of defense costs – one third. *See* ECF No. [44-10] at 1. Based on Mr. Colville's review of Hanover's claims file, notes, and communications, there was no indication from any of the three insurers, including PURE, that they reserved their right to recover their defense costs or their indemnity contribution. Similarly, none of the insurers requested to enter into a subrogation agreement by which they would resolve the underlying lawsuit and then decide priority of

coverage.  In addition to reservation of rights letters sent to the insured, Mr. Colville testified that, when multiple insurance companies are involved, insurance carriers commonly send reservation of rights letters to one another in which they raise the issue of priority of coverage. PURE never sent such a reservation of rights letter to Hanover during the pendency of the underlying lawsuit.

With regard to PURE's request for Hanover's policy, Mr. Colville testified that PURE never made a direct request to Hanover for a copy.  Instead, Ms. Perkins requested the policy from defense counsel who produced the policy contained within the Hanover claims system, consisting of the declarations page with the amount of coverage, the endorsements, and a list of forms.  In responding to PURE's request for the policy, defense counsel did not request anything additional from Hanover.  At some later point in time, PURE requested a copy of Hanover's policy from Dershowitz's insurance broker and from his personal counsel.

### III.   CONCLUSIONS OF LAW

#### a.  Primary versus Excess

In this equitable subrogation action, Florida's substantive law governs the interpretation of the insurance policies at issue.  *See St. Paul Fire & Marine Ins. Co. v. Lexington Ins. Co.*, No. 05-80230-CIV, 2006 WL 1295408, at *4 (S.D. Fla. Apr. 4, 2006).  PURE has asked this Court to determine that Hanover's policy is primary and that PURE's policy is excess by virtue of reviewing the "other insurance" clauses in each policy.  "'Primary coverage' exists where, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability." *Id.*  Excess insurance, on the other hand, "exists where, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." *Id.*  Much like in this case, most insurance policies contain "other insurance"

clauses by which an insurer attempts to limit its liability to the extent "the other insurance covers the same risk." *Id.* These "other insurance" clauses "attempt to control the manner in which each insurer contributes to or shares *a covered loss*." *Id.* (emphasis added).

Importantly, before analyzing the "other insurance" clauses, both insurance policies must provide coverage for the particular loss. *See Sentry Ins. Co. v. Aetna Ins. Co.*, 450 So. 2d 1233, 1236 (Fla. 2d DCA 1984) (citing *Ins. Co. of N. Am. v. Avis Rent-A-Car System, Inc.*, 348 So.2d 1149 (Fla.1977)) ("In cases where *more than one insurer's policy provides coverage for a loss*, it is appropriate to review the insurance contracts to see if the documents address the 'ranking' or contribution of other insurers.") (emphasis added). This is a threshold inquiry that must be satisfied before issues of primary insurance versus excess insurance can be resolved. *See Am. Cas. Co. of Reading Penn. v. Health Care Indem., Inc.*, 613 F. Supp. 2d 1310, 1318 (M.D. Fla. 2009) ("*Where more than one policy provides coverage for a loss*, as in the present case, the priority of the competing policies should be decided by reference to 'other insurance' clauses in the policies.") (emphasis added); *Graphic Arts Mut. Ins. Co. v. Essex Ins. Co.*, 465 F. Supp. 2d 1290, 1294 (N.D. Ga. 2006) ("Where *two or more insurers cover the same risk*, courts examine the language in the 'other insurance' clauses to determine whether each policy is primary or excess with respect to the covered claim.") (emphasis added); *U.S. Auto. Ass'n v. Hartford Ins. Co.*, 468 So. 2d 545, 547 (Fla. 5th DCA 1985) (concluding that "the policies issued by Hartford and USAA *both provide liability coverage* to Amato and the excess insurance provision in the Hartford policy is to be given effect.") (emphasis added); *Aaacon Auto Transp., Inc. v. Demshar*, 312 So. 2d 479, 480 (Fla. 4th DCA 1975), *aff'd sub nom. Demshar v. AAAcon Auto Transp., Inc.*, 337 So. 2d 963 (Fla. 1976) ("*Where two separate insurance policies cover a particular loss* and each contains 'other insurance' clauses which purport to restrict or limit liability, if one of the

policies contains a 'pro rata' clause and the other contains an 'excess insurance' clause, effect is given to the latter clause.") (emphasis added).

In support of its position, PURE directed the Court to two decisions discussing the duties a primary insurer owes the excess insurer.[4]  *See Vigilant Ins. Co. v. Continental Cas. Co.*, 33 So. 3d 734, 737-38 (Fla. 4th DCA 2010) ("In essence, the excess insurer steps into the shoes of the insured with respect to a claim for bad faith against the primary insurance company"); *Progressive Am. Ins. Co. v. Nationwide Ins. Co.*, 949 So. 2d 293, 294 (Fla. 1st DCA 2007) ("[I]n Florida, a primary carrier owes a duty of good faith to an excess carrier – the same duty it owes its insured.").  In these cases, however, there was no dispute as to whether the insurance policies provided coverage or as to which insurer was primary.  *See Vigilant Ins.*, 33 So. 3d at 735 ("Appellant, Vigilant Insurance Company, *an excess insurer*, appeals an order dismissing its complaint for bad faith against Continental Insurance Company, *the primary insurer*.") (emphasis added); *Progressive*, 949 So. 2d at 294 ("It is undisputed that Nationwide is the primary carrier and Progressive the excess carrier. . .").  The Court, therefore, finds these cases inapposite.

The evidence here is that Hanover disputed coverage in the underlying lawsuit and its coverage obligations still remain unresolved.  At trial, Hanover presented evidence that, in the underlying lawsuit, it disputed whether its business liability insurance applied to the claims as it provided coverage for "'personal and advertising injury' caused by an offense arising out of [the insured's] business, but only if the offense was committed in the 'coverage territory' during the policy period."  In addition, Hanover's reservation of rights letters invoked three different

---

[4] At trial, PURE also directed the Court to a decision from the Middle District of Pennsylvania, *Allied World Assurance Co. v. Lincoln Gen. Ins. Co.*, 280 F.R.D. 197 (M.D. Penn. 2012).  This decision involves a discovery dispute over a subpoena and the ability to obtain work product in a bad faith action pending in Florida.  It is unclear to the Court how this decision supports PURE's right to equitable subrogation.

exclusions under the policy. To date, neither Hanover nor PURE has filed a declaratory judgment action to determine whether the claims against Dershowitz were covered under Hanover's policy. And, in this action, PURE has not asked the Court to issue such a declaration as the only count in the Complaint is one for equitable subrogation. *See* ECF No. [1]. No declaratory relief is sought in this action. Moreover, even if it could be implied that PURE is seeking such a declaration as part of its equitable subrogation claim, there is no evidence in the record from which the Court could make such a decision. PURE, which carries the burden of proof, did not provide the Court with any evidence from the underlying lawsuit other than the original complaint. In addition, under the Scheduling Order, the parties had ample time to amend the pleadings and conduct discovery to plead and prove any claims for declaratory relief if they so desired. *See* ECF No. [13]. PURE did not avail itself of such opportunities. Absent evidence shedding light on the applicability of Hanover's policy to the claims against Dershowitz, this Court is unable to undertake a coverage analysis.[5]

By asking the Court to determine who is primary and who is excess, PURE is putting the proverbial cart before the horse. Before the Court can even look at the "other insurance" provisions at issue, this Court is first required to find coverage under both policies. Not only did PURE not seek such relief in the Complaint, but PURE also failed to present any evidence at trial that would allow the Court to make such a determination. Having failed to satisfy its burden of proof on this threshold issue, the Court must find in favor of Hanover.

---

[5] PURE took the position that its policy did not provide coverage for the claims asserted against Dershowitz under the intentional acts exclusion. At trial, Ms. Perkins admitted that Hanover's policy had a very similar exclusion and that, if the intentional acts exclusion applied to PURE, it would likewise apply to Hanover. PURE does not attempt to explain how Hanover could be deemed the primary insurer if the intentional acts exclusion applied to it.

### b. Waiver

Hanover also raised two affirmative defenses at trial: (1) PURE waived its right to seek subrogation, and (2) PURE was a volunteer when it contributed toward the settlement. On the subject of waiver, Florida law provides that when an insurer assumes the defense of an insured and then enters into a settlement agreement knowing facts that take the loss outside of the policy's coverage and "without disclaiming liability or reserving its right to deny liability or coverage, such insurer is thereafter precluded from denying liability." *Lehman-Eastern Auto Rentals v. Brooks*, 370 So. 2d 14, 16 (Fla. 3d DCA 1979). Stated differently, "[a]n insurer waives its right to subrogation when it neither obtains an agreement preserving its right to indemnification, nor in any way disclaims its liability." *Airmanship, Inc. v. U.S. Aviation Underwriters, Inc.*, 559 So. 2d 89, 92 (Fla. 3d DCA 1990) (citing *Lehman-Eastern*, 370 So. 2d at 16). *See also Lumbermens Mut. Cas. Co. v. Foremost Ins. Co.*, 425 So. 2d 1158, 1159-60 (Fla. 3d DCA 1983) ("Lumbermens, in negotiating and settling the claim against their insured, failed to obtain from Foremost an identifiable agreement, either oral or written, preserving a cause of action against Foremost for either indemnity, contribution and/or equitable subrogation and, by its failure to do so, it has waived any claim thereto."). Similarly, an insurer will be deemed a "volunteer" when settling a claim on behalf of an insured, unless the insurer reserves its right to deny liability and to seek reimbursement from other insurers. *U.S. Auto.*, 468 So. 2d at 547.

On the other hand, an insurance carrier does *not* waive its right to subrogation when it repeatedly denies liability and demands that the other insurer defend and indemnify the insured. *Airmanship,* 559 So. 2d at 92 ("[W]e conclude that AVEMCO did not act as a volunteer and that its denials of liability preserved its right to equitable subrogation. To hold otherwise would countenance an insurance company's unilateral action prolonging litigation and would

discourage settlements."); *see also Galen Health Care, Inc. v. Am. Cas. Co. of Reading, Penn.*, 913 F. Supp. 1525, 1531 (M.D. Fla. 1996) ("[N]o agreement is necessary to preserve the right to subrogation when the excess insurer has repeatedly denied liability and demanded that the primary insurer defend the insured party.").

In this case, even if PURE's Complaint sought a declaration of coverage and PURE presented evidence at trial from which the Court could conclude that the Hanover policy applied and was primary, the Court still finds that PURE volunteered its settlement funds and waived the right to seek subrogation against Hanover. At trial, it was undisputed that the insurers did not enter into a subrogation agreement during the underlying lawsuit. It was likewise undisputed that PURE did not enter into an agreement, either oral or written, preserving a cause of action against Hanover for indemnity, contribution or equitable subrogation. Similarly, PURE did not send any letters to Hanover in which it denied liability for the claims against Dershowitz and demanded that Hanover provide coverage.

PURE's entire claim for subrogation is premised upon the January 14, 2015 email from the insurance broker to PURE, Hanover, and CNA stating that all three carriers were defending under a general reservation of rights. However, nothing in this email put Hanover on notice that PURE was reserving its right to seek equitable subrogation or to later determine the priority of coverage. In fact, there is nothing in this email suggesting that it is a general reservation of rights vis-à-vis the three insurers as opposed to a general reservation of rights vis-à-vis the insured, Dershowitz.

Even if the Court looks at PURE's reservation of rights letter, it was sent to the insured, Dershowitz, and only raised the intentional acts exclusion. It was undisputed that PURE never raised priority of coverage in this letter and never raised it while the underlying lawsuit was

pending despite ample opportunity to do so. While PURE attempts to argue that it could not have raised priority of coverage earlier because it did not have a copy of Hanover's insurance policy, PURE never contacted Hanover directly to obtain a copy of the policy. Instead, weeks *after* PURE extended settlement authority to defense counsel for the upcoming mediation, for the first time, it requested a copy of the Hanover and CNA policies from defense counsel. Hanover immediately authorized defense counsel to produce a copy of its insurance policy. Then, while waiting for a copy of the policy, on December 4, 2015, PURE increased the amount of its contribution toward the settlement. It was not until eleven days after this increase in authority that defense counsel sent an email purportedly providing the insurance policies. Although this email did not contain the portion of the Hanover policy needed for a priority-of-coverage analysis, Ms. Perkins still did not contact Hanover to obtain a complete copy. Eventually, more than two months after increasing the settlement authority, Ms. Perkins received a copy of the renewal policy and, at that time, determined that priority of coverage was an issue. PURE *still* failed to raise priority of coverage. The settlement agreement was not finalized until sometime in March or April of 2016 – one to two months after PURE knew about the priority-of-coverage issue. Despite having this knowledge, PURE funded its portion of the settlement without ever raising the issue with Hanover and without preserving its right to subrogation. Under these circumstances, the Court finds that PURE volunteered its contribution to the settlement[6] and, through its actions, waived any right to seek equitable subrogation from Hanover.[7]

---

[6] During closing, PURE also argued that, if it is deemed a volunteer, then Hanover is also a volunteer because Hanover asserted a lack of coverage. The difference is that, unlike PURE, Hanover is not asserting a claim for equitable subrogation in this action. This Court has not been asked to determine whether Hanover has a right of equitable subrogation against PURE or CNA; therefore, the question of whether Hanover was a volunteer is not at issue.

[7] At trial, PURE asked the Court to consider the facts of this case "holistically" because the underlying lawsuit presented unique factual circumstances in that the insured was a quasi-public figure, the allegations were inflammatory, and PURE was concerned about taking any actions that would impact the

**IV.   CONCLUSION**

For the foregoing reasons, the Court finds that PURE failed to satisfy its burden to prove the Hanover policy is primary and that Hanover owes any duty to PURE.  Further, even if the Hanover policy is primary, the Court finds that PURE waived its right to equitable subrogation against Hanover by volunteering the settlement funds without any preservation of its right to later recover them.  As a result, judgment must be entered in favor of Hanover.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment for Hanover by separate order.

**DONE AND ORDERED** in Miami, Florida, this 19th day of January, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of record

---

settlement and adversely affect its insured.  However, every case arguably presents unique factual circumstances.  If the Court allowed an insurer to wait until after it funded a settlement to assert a question of priority of coverage because of unique factual circumstances, it would create an exception that would swallow the rule.  The Court declines to adopt such an approach.